1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                   FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9   MICHAEL LEE CARTER,                )      Case No. 2:04-cv-00272-MSB
                                        )
10              Petitioner,             )      **ORDER**
                                        )
11   vs.                                )
                                        )
12   A. K. SCRIBNER, Warden,            )
                                        )
13              Respondent.             )
    _____    )
14

15          Petitioner Michael Lee Carter is a California State Prisoner proceeding with appointed

16   counsel on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is serving

17   a sentence of 25 years, having entered a *nolo contendere* plea in El Dorado County Court in 1999

18   to the allegation of attempted murder of Jesse James Teach with an enhancement for personal use

19   of a firearm.  (Dkt. #27 at 2-3).  He contends that he was denied effective assistance of counsel in

20   violation of the Sixth Amendment because his defense attorney, James Clark, had a pre-existing

21   relationship with the victim, Jesse Teach, and had previously represented his "putative co-

22   defendant," Shane Lesher.  (*Id.* at 8-16).  Petitioner further contends that he would not have entered

23   a *nolo contendere* plea had he been aware of these relationships.  (*Id.* at 16-17).  The Court denies

24   the petition for writ of habeas corpus.

    **I.      Factual Background**

25          On November 20, 1998, Jesse Teach was shot when a group of four individuals drove up to

26   him while he was using a payphone.  (Dkt. #39, Exh. N at 1).  Teach was unable to identify the

27

28

1    shooter but believed they were the same individuals who had robbed him several nights earlier.  (*Id.*
2    at 5).[1]  When Petitioner was later interviewed by the police, he admitted shooting Teach but claimed
3    the shooting had been in self defense.  (*Id.* at 11-12).

4        On November 25, 1998, the El Dorado County District Attorney filed a criminal complaint
5    alleging that Petitioner attempted the willful, deliberate, and premeditated murder of Jesse Teach.
6    (Dkt. #34, Exh. A).  Petitioner subsequently pled *nolo contendere* to attempted murder, pursuant to
7    a "negotiated plea of low term sentence."  (*Id.*, Exh. B).  He was sentenced to a low term of 5 years,
8    with a firearm enhancement of 20 years.  (*Id.*, Exh. C).

9        **A.    Clark's Relationship with Teach**

10       Petitioner claims that in February 2003 he first learned of a pre-existing relationship between
11   Clark, Petitioner's trial counsel, and Teach.  Clark was deposed on August 11, 2004, pursuant to a
12   court order.  (Dkt. #10).

13       In his deposition, Clark stated that he first knew Teach from participating in a Little League
14   baseball league.  (Dkt. #37, Exh. M at 8:21-9:5).  Both he and Teach's father, Larry, coached the
15   team on which Teach played.  (*Id.*).  He had a friendly relationship with Teach's father and was
16   familiar with the rest of the Teach family, but he did not socialize with them.  (*Id.* at 9:10-11:5).
17   Clark was also aware that Jesse Teach was getting into trouble in the late 1990s, because he kept
18   "track of (his) kids" from Little League and was in contact with Teach's father.  (*Id.* at 13:3-8).
19   Clark characterized his relationship with Teach's father as "based on how do you do," typical of "a
20   very small town."  (*Id.* at 14:17-18, 9:21).  Still, when discussing his subsequent representation of
21   Teach, Clark explained, "I really feel sorry for Larry. Larry being a good father said, Jim, would you
22   do me a favor, would you help my kid out. Sure, Larry, for you.  Again, it goes back to little league
23   days. I don't think any money was exchanged, that is irrelevant."  (*Id.* at 35:10-14).

24       Clark stated that he represented Jessie Teach on two occasions *after* his representation of
25   Petitioner: on May 12, 1999, in a violation of probation proceeding; and on June 28, 1999, when

---

27       [1] Shane Lesher was later identified as a participant in the robbery. (Dkt. #34, Exh. L).
28   Apparently for this reason, Petitioner refers to Lesher as his "putative co-defendant" in the
     Teach shooting.

-2-

1   Teach testified as a witness in Lesher's preliminary hearing regarding a home invasion robbery that

2   occurred just before the shooting. (Dkt. ## 37-38, Exh. M at 27:22-28:8, 33:24-36:22). Although

3   he had no recollection of representing Teach before May 12, 1999, Clark stated that "it very well

4   may have been" that he represented Teach in juvenile proceedings before 1999. (Dkt. #38, Exh. M

5   at 28:18-29:7). "[T]he bottom line is that I'm the type of guy if I know a kid is in trouble and I like

6   the parents, I just sort of step in for nothing and do it." (*Id.*).

7        In his declaration, Petitioner states that Clark did not disclose that he knew Teach. (Dkt. #27,

8   Pet. Decl. at 1:5-11). In his deposition, however, Clark stated that "at some point" he told Petitioner

9   that he knew Teach, and that he "considered Mr. Teach to be . . . a shit," but he cannot recall when

10  he made the disclosure or whether he provided any further explanation. (Dkt. #38, Exh. M at 44:8-

11  45:4).

12       **B.    Clark's Prior Representation of Lesher**

13       During his deposition, Clark also revealed that he had previously been appointed to represent

14  Lesher in a vehicle theft case in 1997. (Dkt. #37, Exh. M at 24:19-25:7). Clark negotiated a *nolo*

15  *contendere* plea for Lesher, which resulted in a short period of confinement in El Dorado County

16  Jail and several years of probation. (Dkt. #39, Ex. N at 41-49). Petitioner claims that Clark did not

17  disclose he previous representation of Lesher. (Dkt. #27, Pet. Decl. at 1:5-11).

18       **C.    Clark's Advice Regarding Petitioner's Plea**

19       Clark's representation of Petitioner consisted of one meeting with Petitioner in the jail lasting

20  between half an hour and one hour and two telephone calls with Petitioner lasting under fifteen

21  minutes each. (Dkt. #38, Exh. M at 37:15-38:9). During his deposition, Clark provided the

22  following explanation for advising Petitioner to accept the plea deal:

23       This issue was going to be was it premeditated or non-premeditated attempted
         murder. . . . You have Hamman [a co-defendant] saying Carter did it. You have
24       Carter saying, yeah, I did it, but, guys, it was self-defense. Then the two
         eyewitnesses – one eye witness, Laher comes in at that point and says she saw him
25       squared up and saw him with the bandanna over his face. . . . none of them ever
         mentioned any discussion about Teach pulling a gun. You know, I mean, I didn't
26       think that self-defense was going to last long. I felt that was specious, quite candidly.

27           . . .

28       Looking at the evidence, I think the jury is going to come down with premeditated.
         . . . So he is looking at 20 years to life . . . I get an offer, he pleads to non-

1   premeditated. . . . He gets a low-term of 5, okay, he has to bite down on the 20 years
2   enhancement. . . . On the one hand he has 25 years, a determinate sentence; on the
    other hand, he has 20 years to life, an indeterminate sentence. Based on the present
3   – on the political climate at that time, and I don't think it's changed too much quite
    candidly, he is never getting out of jail.

4   (*Id.* at 53:20-55:19).  Clark further stated that his relationship with Teach "wasn't going to affect

5   how I represented Mr. Carter," and that his advice "was based on what [he] thought was best for Mr.

6   Carter."  (*Id.* at 52:19-20, 53:11-12).

7       Petitioner does not contest Clark's reasoning with regard to the *nolo contendere* plea. Rather,

8   in his declaration, Petitioner states:

9       I did not want to plead guilty, but I entered a *West* plea because Clark explained to
        me that going to trial would have been too great a risk, that the evidence against me
10      was too strong. . . . Had I known of the conflict of interest and the [sic] he had
        previously represented Lesher, and was friends with Teach and the Teach family I
11      would not have pled guilty.

12  (Dkt. #27, Pet. Decl. at 1:16-23).

13  **II.    Procedural History**

14      Petitioner claims that he was alerted to Clark's relationship with Teach around February

15  2003, when "Leana Browning working as an investigator on behalf of the petitioner procured a copy

16  of a Court transcript" in which Clark identifies himself as Teach's attorney.  (Dkt. #35, Exh. G at

17  12).  The events recorded in the transcript occurred several months after Petitioner's plea.  (*Id.*)

18      On February 3, 2003 Petitioner filed a state habeas petition in El Dorado County Superior

19  Court, alleging that his attorney had a conflict of interest because of the relationship Clark had with

20  Teach. (Dkt. #34, Exh. E).  The Superior Court denied his petition, stating only that "Petitioner fails

21  to state sufficient facts to establish a prima facie [claim] for relief."  (*Id.*).  The California Court of

22  Appeals denied his appeal, (Dkt. #34, Exh. F), citing *In re Swain*, 34 Cal. 2d 300 (1949), thereby

23  indicating that Petitioner had not stated facts fully or with sufficient particularity.  Petitioner's state

24  remedies with regard to the Clark/Teach claim were then exhausted on December 10, 2003, when

25  the California Supreme Court summarily dismissed his appeal without comment or citation.  (Dkt.

26  #35, Exh. G).

27      On February 5, 2004, Petitioner filed a federal habeas petition. (Dkt. #1).  Following Clark's

28  deposition, Petitioner filed a supplemental memorandum that included a claim concerning Clark's

1   prior representation of Lesher.  (Dkt. #12).  Respondent then filed an answer, (Dkt. #18), and

2   Petitioner filed a traverse.  (Dkt. #19).  Finding that "[t]he supporting facts and theory of this claim

3   [were] wholly different from those set forth in the initial petition," the district court ordered that the

4   petition be held in abeyance while Petitioner exhausted his state remedies with regard to the

5   Clark/Lesher claim.  (Dkt. #22).  On May 5, 2006, the California Supreme Court dismissed

6   Petitioner's second habeas petition, (Dkt. #37, Exh. J), citing *In re Miller*, 17 Cal. 2d 734 (1941),

7   indicating that the petition  was barred as a successive claim, and *In re Clark*, 5 Cal. 4th 750 (1993),

8   indicating that it was untimely.

9          On June 21, 2006, having exhausted both claims, Petitioner filed an amended federal

10  petition.  (Dkt. #27).  On July 13, 2006, Respondent indicated that it would stand on its original

11  answer.  (Dkt. #32).

12  **III.    Standard of Review**

13         Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may

14  not grant a habeas corpus petition with respect to any claim adjudicated on the merits in state court

15  unless the state court determination: "(1) resulted in a decision that was contrary to, or involved an

16  unreasonable application of, clearly established Federal law, as determined by the Supreme Court

17  of the United States; or (2) resulted in a decision that was based on an unreasonable determination

18  of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)

19  (2006).  "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or

20  principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*

21  *v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted).  "A decision is 'contrary to' federal law

22  when the state court applies a rule of law that contradicts the governing law set forth in Supreme

23  Court precedent or when the state court makes a determination contrary to a Supreme Court decision

24  on materially indistinguishable facts." *Pinholster v. Ayers*, 525 F.3d 742, 756 (9th Cir. 2008) (citing

25  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  "A state court unreasonably applies federal law

26  when its application of Supreme Court precedent to the facts of petitioner's case is objectively

27  unreasonable." *Id.* (citing *Williams*, 529 U.S. at 409).

28

1    "Deference to state court decisions applies only to claims the state court adjudicated on the

2    merits." *Id.* (citing *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004)).  A claim is "adjudicated

3    on the merits" when the state court issues a decision "that is based on the substance of the claim

4    advanced, rather than on a procedural, or other, ground." *Lambert*, 393 F.3d at 969 (quoting *Sellan*

5    *v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)).  "The California Supreme Court's denial of a habeas

6    petition without comment or citation constitutes a decision on the merits of the federal claims."

7    *Pinholster*, 525 F.3d at 756 n.11 (citations omitted).  "[W]hen federal courts are presented with a

8    state court decision that is unaccompanied by any *ratio decidendi*[,] . . . an independent review of

9    the record is required to determine . . . whether the state court's decision was [an] objectively

10   reasonable" application of federal law.  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  By

11   contrast "[d]e novo review, rather than AEDPA's deferential standard, is applicable to a claim that

12   the state court did not reach on the merits."  *Lewis v Mayle*, 391 F.3d 989, 996 (9th Cir. 2004)

13   (citation omitted).

14   **IV.   Discussion**

15        **A.   Timeliness**

16        Respondent's answer contends that the initial petition was untimely under 28 U.S.C.

17   §2244(d)(1) and (2).  (Dkt. #18 at 2).

18        Under AEDPA, a one-year statute of limitations applies from "the date on which the factual

19   predicate of the claim or claims presented could have been discovered through the exercise of due

20   diligence."  28 U.S.C. § 2244(d)(1)(D).  In addition, the limitations period is tolled while the

21   Petitioner pursues his remedies in state court. 28 U.S.C. § 2244(d)(2).  Here, although Petitioner's

22   federal habeas petition was filed on February 5, 2004, just over one year after he had learned of

23   Clark's relationship with Teach, Petitioner's appeal with respect to that issue was pending in the

24   state Supreme Court until December 10, 2003.  His second federal habeas petition was filed in state

25   court shortly after Petitioner discovered the factual bases for his claims.

26        "[T]o have the factual predicate for a habeas petition . . . a petitioner must have discovered

27   (or with the exercise of due diligence could have discovered) facts suggesting" all elements of a

28   claim.  *Hasan v. Garza*, 254 F.3d 1150, 1154 (9th Cir. 2001).  As Petitioner is alleging that his

1   attorney had conflicts of interest, the relevant inquiry is when he discovered, or could have

2   discovered, facts suggesting "that an actual conflict of interest adversely affected his lawyer's

3   performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

4       Petitioner submitted his first state habeas petition on February 3, 2003, apparently

5   immediately after becoming aware that Clark had a relationship with Teach. Petitioner admits that

6   "Clark may have told me that he knew Shane Lesher," (Dkt. #27, Pet. Decl. at 1:8-9), but maintains

7   that he did not learn of Clark's prior *representation* of Lesher, the basis for his second claim for

8   relief, until Clark's deposition on August 11, 2004. He filed his second state habeas petition based

9   on the Clark/Lesher claim on June 10, 2005, less than one year later.

10       There is no evidence indicating that Petitioner could have learned of these relationships at

11   an earlier date through the exercise of due diligence. "Due diligence does not require 'the maximum

12   feasible diligence,' but it does require reasonable diligence in the circumstances." *Schlueter v.*

13   *Varner*, 384 F.3d 69, 74 (3rd Cir. 2004) (quoting *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir.

14   2004)). "[T]he question whether a habeas petitioner has exercised due diligence is context specific."

15   *Wilson v. Beard*, 426 F.3d 653, 661 (3rd Cir. 2005). While the parties dispute whether Clark

16   provided any disclosure of his relationships with Teach or Lesher at all, it is clear that Clark did not

17   provide much detail. Clark states "I'm pretty sure I told him, hey, I know Teach, he is a shit, I'm

18   not happy with him. I mean, those are the basic thoughts I communicated to Mr. Carter." (Dkt. #38,

19   Exh. M at 50:22-25). It would be unreasonable to expect a client independently to inquire into

20   potential conflicts based on such vague revelations. For this reason, the California State Bar Rules

21   of Professional Conduct require that attorneys provide written disclosure of any "legal, business,

22   financial, professional, or personal relationship with a party or witness in the same matter." State

23   Bar of Cal., Rules of Prof'l Conduct R. 3-310 (2009). In light of Clark's vague, partial, and

24   potentially misleading oral disclosure, this Court cannot conclude that Petitioner failed to exercise

25   due diligence at the time of his plea.

26       **B.**    **State Procedural Default**

27       "When a state-law default prevents the state court from reaching the merits of a federal

28   claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S.

1    797, 801 (1991) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)).  "'Procedural default is

2    an affirmative defense, and the state has the burden of showing that the default constitutes an

3    adequate and independent ground' for denying relief."  *Scott v. Schriro*, 567 F.3d 573, 580 (9th Cir.

4    2009) (per curiam) (quoting *Insyxiengmay v. Morgan*, 403 F.3d 657, 665 (9th Cir. 2005)).  "To

5    constitute an adequate and independent state procedural ground sufficient to support a state court's

6    finding of procedural default, 'a state rule must be clear, consistently applied, and well-established

7    at the time of petitioner's purported default.'"  *Id.* (quoting *Lambright v. Stewart*, 241 F.3d 1201,

8    1203 (9th Cir. 2001)).

9          As a preliminary matter, Respondent did not expressly raise Petitioner's state procedural

10   defaults in its answer and thus waived the affirmative defense of a procedural bar.  *Franklin v.

11   Johnson*, 290 F.3d 1223, 1229 (9th Cir. 2002).  Furthermore, even if Respondent's assertion that

12   Petitioner's action is untimely could be construed as a reference to a state procedural default, the

13   Ninth Circuit has held that California's timeliness rule is not sufficiently clear to bar federal review,

14   especially in the context of non-capital cases.  *Townsend v. Knowles*, 562 F.3d 1200, 1207-08 (9th

15   Cir. 2009).

16         **C.    Sixth Amendment Claims**

17         The California Supreme Court denied Petitioner's Clark/Teach claim on the merits but

18   without comment or citation.  The California Court of Appeals denied Petitioner's claim, citing only

19   to *In re Swain*, and the Superior Court denied Petitioner's claim stating only that "Petitioner fail[ed]

20   to state sufficient facts to establish a prima facie [claim for relief]."  Because there is no reasoned

21   state court decision, the Court will review the record to determine whether the state courts' denial

22   of the petition was an objectively unreasonable application of controlling federal law.  *Delgado*, 223

23   F.3d at 981-82.

24         By contrast, the California Supreme Court denied Petitioner's Clark/Lesher claim on purely

25   procedural grounds, citing *In re Miller* and *In re Clark*.  Because this procedural dismissal does not

26   constitute an adjudication on the merits, this Court will review Petitioner's Clark/Lesher claim *de

27   novo*.  *See Lambert*, 393 F.3d at 969; *Ramirez v. Almager*, 619 F. Supp. 2d 881, 906 (C.D. Cal.

28   2008).

i. Clark/Teach Claim

In general, to prevail on a conflict of interest claim, the petitioner must show that "an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 348. "[T]he *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002); *see Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006). To show an adverse effect, a petitioner must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was . . . not undertaken due to the attorney's other loyalties." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (internal quotation omitted); *see also United States v. Shwayder*, 312 F.3d 1109, 1118 (9th Cir. 2002) ("To show that an actual conflict had an adverse effect, . . . the defendant must establish that counsel was influenced in his basic strategic decisions by the [conflicting] interests.") (internal quotation marks and citation omitted).

Clark's pre-representation relationship with Teach, whether it was truly in passing or involved something more, created a "theoretical division of loyalties." *Mickens*, 535 U.S. at 171. Still, Petitioner has not shown that Clark's relationship manifested itself in an actual conflict that negatively impacted the quality of his representation of Petitioner. Petitioner does not point to some alternative analysis of the plea offer or an unexplored legal strategy that could have impacted plea bargaining or his chances at trial. Rather, Petitioner asserts only that "[a]t the time petitioner pled guilty, petitioner's lawyer was obviously [] more concerned about the victim, Teach, and his former client, Lesher." (Dkt. #27 at 16).

Petitioner also frames his conflict of interest claim as a constructive denial of counsel claim, arguing that "[i]n fact and effect, petitioner was without counsel at the time of his plea." (*Id.*). But this is only another way of stating the actual conflict issue, and is governed by the same analysis.

True, "constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *see Mickens*, 535 U.S. at 166 ("We have spared the defendant the need of showing probable effect upon the outcome, and have

1   simply presumed such effect, where assistance of counsel has been denied entirely or during a

2   critical stage of the proceeding."). But constructive denial of counsel arises only in circumstances

3   where "[p]rejudice . . . is so likely that case-by-case inquiry into prejudice is not worth the cost."

4   *Strickland*, 466 U.S. at 692. And, with regard to conflict allegations, "circumstances of that

5   magnitude . . . arise when the defendant's attorney actively represented conflicting interests."

6   *Mickens*, 535 U.S. at 166 (internal quotation marks omitted). The Ninth Circuit has "described this

7   principal as the '*Sullivan* exception,' to the rule that a habeas petitioner must show prejudice in

8   connection with his ineffective assistance of counsel claim." *Foote v. Del* Papa, 492 F.3d 1026,

9   1029 (citing *Earp v. Ornoski*, 431 F.3d 1158, 1183 (9th Cir. 2005)). "The *Sullivan* exception applies

10  where the petitioner shows: (1) that his counsel actively represented conflicting interests; and (2)

11  that this adversely affected his counsel's performance." *Id.* at 1182 (citing *Sullivan*, 446 U.S. at

12  348); *see Strickland*, 466 U.S. at 692 (noting that the presumption of prejudice applied to conflict

13  claims "is not quite the per se rule of prejudice" applied to denial of counsel claims). Because, as

14  the court has noted, the facts alleged state, at best, a potential conflict of interest, Petitioner fails to

15  state a claim of constructive denial of counsel, and, regardless of the way it is framed, Petitioner's

16  claim is governed by *Sullivan*.

17          After reviewing the record, the Court concludes that the California Supreme Court was not

18  unreasonable in denying Petitioner's conflict of interest claim stemming from Clark's relationship

19  with Teach.

20                          ii. Clark/Lesher Claim

21          Petitioner amended his petition in June 2006 to include an additional claim based on Clark's

22  prior representation of his "putative co-defendant," Shane Lesher. "Conflicts of interest can arise

23  both in cases of simultaneous and successive representation. Generally, it is more difficult to show

24  an actual conflict resulting from successive rather than simultaneous representation." *Mannhalt v.

25  Reed*, 847 F.2d 576, 580 (9th Cir. 1988) (citation omitted). "In successive representation, conflicts

26  of interest may arise if the cases are substantially related or if the attorney reveals privileged

27  communications of the former client or otherwise divides his loyalties." *Hovey*, 458 F.3d at 908

28  (quoting *Mannhalt*, 847 F.2d at 580). Petitioner fails to meet this standard. Clark was appointed

to represent Lesher in an auto theft case approximately one and half years before Clark represented

Petitioner.  Clark represented Lesher for a short period of time and negotiated a favorable plea for

him.  (Dkt. #39, Exh. N at 41-49).  Clark's representation of Lesher and the facts underlying

Lesher's case appear to be entirely unrelated to Clark's representation of Petitioner.  In addition,

there is no indication that Clark manifested any division of his loyalties.  Moreover, Petitioner fails

to demonstrate that this alleged conflict adversely affected Clark's performance. *See Earp*, 431 F.3d

at 1182.

The Court has reviewed Petitioner's successive representation claim *de novo* and determines

that Petitioner fails to demonstrate an actual conflict of interest that adversely affected his counsel's

performance.

**Accordingly,**

**IT IS HEREBY ORDERED** denying the petition for writ of habeas corpus.  (Dkt. #1).

**IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment

accordingly.

DATED this 20th day of November, 2009.


/s/ Marsha S. Berzon
MARSHA S. BERZON
United States Circuit Judge, sitting by designation